(Reap. Dec. 9938)

DALMINTER, INC.  
R. W. SMITH } *v.* UNITED STATES

Entry Nos. 641–H; 29–H.

(Decided March 7, 1961)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiffs.

*William H. Orrick, Jr.,* Assistant Attorney General (*Daniel I. Auster* and *Samuel D. Spector,* trial attorneys), for the defendant.

LAWRENCE, Judge: Importations of seamless steel tubing from Italy were appraised upon the basis of United States value, as defined in section 402(e) of the Tariff Act of 1930 (19 U.S.C. § 1402(e)), as amended by the Customs Administrative Act of 1938, prior to its amendment by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, supplemented by T.D. 54521.

Plaintiffs' appeals for a reappraisement—R58/459, in the name of Dalminter, Inc., and R58/451, in the name of R. W. Smith (for the account of Dalminter, Inc.)—were consolidated for trial.

The parties are agreed that United States value is the proper statutory basis for appraising the merchandise but disagree upon the deductions to be allowed for profit and general expenses, as provided by the terms of section 402(e), *supra.*

Section 402(e) reads as follows, certain portions being stressed:

The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic

consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other *necessary expenses* from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for *general expenses,* not to exceed 8 per centum on purchased goods.

Plaintiffs concede that the appraiser made proper allowances for inland freight and ocean freight, as well as the proper cash discount of 2 per centum; but contend that the allowance for profit should be 7.15 per centum and the allowance for general expenses 7.60 per centum, a total of 14.75 per centum instead of 9.09 per centum, which was allowed by the appraiser.

The evidence introduced at the trial consists of the testimony of two witnesses—Joseph Coulon, an attorney and certified public accountant, and John A. Guidera, an employee of Dalminter, Inc., both of whom were called by the plaintiffs.

Plaintiffs also offered in evidence a corporate financial report (collective exhibit 1) and two pricelists (collective exhibit 2) and collective exhibit 3) relating to the period of these importations, July 1955, or immediately prior thereto, the latter bearing notations by the witness Guidera respecting prices that became effective during the period in controversy.

The witnesses for plaintiffs were well qualified and their testimony stands unrefuted and uncontradicted.

It is established by the evidence of record that Dalminter, Inc., is an importer of what are known in the trade as oil country tubular goods, which, upon arrival in this country from Italy, are stockpiled in warehouses or storage yards of independent warehouse companies, where the merchandise is held by them until it is sold for consumption in the United States.

Pursuant to an established practice, purchasers in the United States of foreign-made seamless steel tubing have it inspected by an independent agency prior to its shipment from Italy to see that it meets American Petroleum Institute standards, the cost of inspection being borne by the purchaser. It is a cost item which is separate from and no part of the purchase price of the tubing, payment being made directly to the inspection agency. By way of illustration, the inspection charges in the instant case were performed at the mill in Italy by the Moody Engineering Co., the cost thereof being paid by the plaintiffs. These charges are shown in schedule A, column 5 of collective exhibit 1, and amount to $16,891.88 or 0.96 per centum of the net income from sales.

Upon arrival at the pier in the United States, the merchandise is transported to warehouses or storage yards, above referred to, for which charges accrue for transportation as well as for handling and storage. Such charges are incurred in connection with the sale of any and all merchandise from stock.

Steel tubing, such as that here under consideration, previously imported from Italy, was freely offered for sale and sold in Houston, Tex., the principal market of the United States at the time of exportation of the imported merchandise (July 1955), at prices shown on collective exhibits 2 and 3, less a cash discount of 2 per centum. These prices, which will be shown, *infra*, were without restrictions of any kind. The price did not vary with the quantity purchased so that there is no question here as to what constitutes a usual wholesale quantity.

The evidence contained in the financial report, collective exhibit 1, and the pricelists, collective exhibits 2 and 3, together with the appraiser's returns of value, shown on the consular invoices herein, establishes material factors which enter into the determination of the questions at issue.

The schedule below sets forth the United States selling price of the grades and sizes of tubing in controversy, with deductions for a cash discount. It also shows allowances for profit, general expenses, ocean freight, inland freight, and duty, which were deducted by the appraiser in arriving at United States value:

| Grade and size | Selling price in US | Less 2% cash discount | Less allowance for profit and general expenses of 9.09% | Appraiser's return |
|---|---|---|---|---|
| N–80 2⅜″ x 0.190″ | $70. 39 | $68. 97 | $62. 70 | $62.70 less ocean freight of $13.50 per metric ton less inland freight of $6 per metric ton less U.S. duty included of 4% and 12½% |
| N–80 2⅞″ x 0.217″ | 95. 25 | 93. 345 | 84. 86 | $84.86 less deductions as above |
| J–55 2⅜″ x 0.190″ | 58. 50 | 57. 33 | 52. 11 | $52.11 less ocean freight of $13.50 per metric ton less inland freight of $6 per metric ton less U.S. duty included of 12½% |

It is observed that the appraiser did not separately itemize the allowances for profit and general expenses, which, by mathematical calculation, were as above indicated, 9.09 per centum. It is established, however, by collective exhibit 1, that the actual profit was 7.15 per centum, which figure deducted from 9.09 per centum allowed by the

appraiser, would leave but 1.94 per centum to be allotted to general expenses. The statute provides for an allowance of profit, not to exceed 8 per centum, and a "reasonable allowance" for general expenses, not to exceed 8 per centum on purchased goods.

It is the contention of plaintiffs that, in arriving at the deductions to be made for general expenses, allowances should be made for the inspection charges above referred to as well as for transportation, storage, and handling charges incurred after arrival of the merchandise in the United States.

Collective exhibit 1 establishes the following facts, as of the period of exportation of the subject merchandise:

| | |
|---|---|
| Total net income from sales (collective exhibit 1, page 1, item 1) | $1,760,382.70 |
| Cost of inspection (collective exhibit 1, page 2, column 5) | 16,891.88 or 0.96% |
| Cost of freight to storage yard (collective exhibit 1, page 2, column 7) | 30,927.25 or 1.76% |
| Cost of storage (collective exhibit 1, page 2, column 6) | 7,615.18 or 0.43% |
| Office and other expense (collective exhibit 1, page 3) | 78,308.31 or 4.45% |
| Total from the net income of sales | 7.60% |

The profit, before a reserve for additional customs duty and Federal income taxes, amounted to $125,855.28 (page 1, column 2) equal to 7.15 per centum of net income from sales.

The accuracy of the figures above set forth is not challenged by the Government; hence, the case resolves itself into a question whether or not, as a matter of law, deductions from the United States selling price should be allowed for the inspection charges in Italy as well as for charges incurred after arrival of the merchandise in the United States for transportation, handling, and storage incident to placing the merchandise in independent warehouses or storage yards prior to its sale to the consumer.

While this appears to be a case of first impression, there are certain judicial authorities from which helpful analogies may be drawn to assist in solving the problem before the court.

It is well established that the statutory provisions for United States value, and for cost of production, were designed by Congress as a means of arriving at a constructive foreign or export value, *United States* v. *New York Merchandise Co., Inc.*, 31 C.C.P.A. (Customs) 213, C.A.D. 274; *Lionel Trading Co., Inc.* v. *United States*, 24 C.C.P.A. (Customs) 432, T.D. 48900. In the *New York Merchandise* case, *supra*, the court stated, in part:

* * * we think it not improper to say, and it has been elsewhere often said, that in arriving at United States value or the cost of production under the act of 1930 of [or] other acts similar in character, we must take into consideration the fact that Congress was trying, by including certain items and excluding

others, to arrive at what might be comparable to a foreign value or an export value if there had been one, * * *.

In the *Lionel* case, *supra*, the court stated, in part:

* * * and as has been held by this court, the determination of the cost of production is an effort to arrive at a substitute for a foreign-market value. * * *

citing *United States* v. *Henry Maier*, 21 C.C.P.A. (Customs) 41, T.D. 46378.

It is also noted that in cases involving foreign and export value inspection costs have been held not to be a part of the dutiable value of the merchandise, *United States* v. *Alfred Kohlberg, Inc.*, 27 C.C.P.A. (Customs) 223, C.A.D. 88; *United States* v. *New York Merchandise Co., Inc.*, 30 Cust. Ct. 599, A.R.D. 17. The *Kohlberg* case related to the appraisement of certain handkerchiefs and bedspreads from China, and one of the questions presented, in that case, was whether a payment to Chinese "No. 1 Boys" for services rendered inspecting the merchandise after it had been received from the seller in China was a part of the expenses which the statute provides shall be included in the dutiable value of the merchandise. The court held that it was not.

In *United States* v. *New York Merchandise Co., Inc., supra*, this court held that where:

* * * the importer employed an agent in Japan, Strong & Co., who furnished a man to accompany its buyer to the different manufacturers, later checked the progress of the manufacturer and the time of delivery of the merchandise, saw that the goods were delivered to the warehouses of Strong & Co., where they were inspected, checked for size and quantity, compared with samples, prepared the merchandise for shipment, arranged for shipping space, and shipped the goods to the importer * * *

for which a commission of 6 per centum was paid it, formed no part of the export value of the merchandise.

In its brief, defendant contends that the claim of plaintiffs for an allowance of the inspection charges is not one of the charges to be deducted, pursuant to the terms of section 402(e), basing its argument upon the case of *General Dyestuff Corp.* v. *United States*, 19 C.C.P.A. (Customs) 309, T.D. 45480, wherein the amount of a royalty which was paid by the American importer to someone other than the seller was held by the court to be a charge which should not be deducted from United States value.

An extract from the opinion in the *General Dyestuff* case, quoted in the brief of the defendant, reads as follows:

Whatever the fact *might have been* as to when, as a matter of legal compulsion, the purchasers must have paid the royalty for using the merchandise bought from the importer, the actual fact *is* that they did pay it, or agreed as a part of the contract, to pay it, at the same time that they paid the other purchase money. Furthermore, it is an admitted fact that the purchasers

could not have bought the merchandise without so paying or agreeing to pay this added 10 per centum of the basic price. [Italics quoted.]

It is notable that the royalty, above referred to, was part of the "contract" and was paid "at the same time that they paid the other purchase money" and, furthermore, that the purchasers could not buy the merchandise without paying or agreeing to pay the amount of said royalty. In the instant case, however, as pointed out earlier in this opinion, the inspection charge is not a part of the purchase price, is not the result of any contract with the purchaser, nor of any legal requirement; it is merely a precautionary measure by means of which the purchaser is assured of American Petroleum Institute standards, and it is the usual practice of the trade in oil country tubular goods.

Defendant also argues at length in defense of the appraiser's action in disallowing the inspection charges upon the ground that they cannot be considered as "necessary expenses from the place of shipment to the place of delivery," citing cases.

This argument apparently overlooks the fact that plaintiffs are not claiming that the inspection charges are "necessary expenses" within the meaning of section 402(e) ; in fact, plaintiffs, in their brief, have expressly disavowed any such contention, but claim that those charges do fall within the provision for reasonable "general expenses" in another portion of said section 402(e).

The nearest approach to a case defining in specific terms what may be included within the phrase "general expenses" is *United States* v. *Alfred Dunhill of London, Inc.*, 32 C.C.P.A. (Customs) 187, C.A.D. 305. In that case, the court held that a British purchase tax was not properly part of the cost of production of certain imported merchandise. In the course of its opinion, the court took occasion to define the meaning of the words "usual general expenses," as they appear in section 402(f)(2) of the Tariff Act of 1930, in arriving at the cost of production, as follows:

In our opinion the "usual general expenses" of a business are the expenses of doing business. This would include in addition to the cost and manipulation of materials, all salaries, wages and commissions, traveling expenses, advertising, rents, taxes on buildings, stationery, stenographic, telephone and telegraph expenses, costs of delivery, depreciation on plant and equipment, and other actual outlays. These are the usual general expenses of business, and profit is calculated on the difference between such expenses and receipts.

The court there gave a clear expression to the broad scope of the words "usual general expenses" approving deductions, within the statutory limit, of such items, among others, as "commissions," "costs of delivery," and "other actual outlays." No reason is apparent for not attributing to the term "general expenses" in section 402(e) the

same meaning which was ascribed to the phrase "usual general expenses" in section 402(f)(2), as was done in the *Dunhill* case.

Bearing in mind the well-settled doctrine that the statutory provisions for United States value and for cost of production were intended by Congress to result in constructive foreign or export value, the definition of "usual general expenses," above quoted, supports the plaintiffs' contention that the inspection charges should be allowed as one of the general expenses provided by section 402(e).

By analogical reasoning, the *Dunhill* case likewise supports plaintiffs' contention that the charges for transportation, handling, and storage should properly be allowed. Those charges are, as stated in *Dunhill*, "actual outlays." They are the "usual general expenses of business, and profit is calculated on the difference between such expenses and receipts."

Plaintiffs' brief invites the attention of the court to the case of *Johnson Co.* v. *United States*, 13 Ct. Cust. Appls. 373, T.D. 41318. The court was there concerned with the question of the proper allowances to be made from the United States selling price to make United States value of consigned merchandise under section 402(d) of the Tariff Act of 1922. The plaintiff, in that case, claimed that expenses incurred in the United States for transportation, storage, and delivery were "general expenses"; and, on rehearing, *id.* v. *id.*, 13 Ct. Cust. Appls. 626, T.D. 41480, were "other necessary expenses from the place of shipment to the place of delivery." Both claims were denied. However, in its earlier decision, 13 Ct. Cust. Appls. 373, at 384, the court observed:

\* \* \* It is evident this provision for "general expenses" has reference only to purchased goods It is conceded in the case at bar that the goods imported are on consignment. \* \* \*

After quoting the provision in section 402(d) of the Tariff Act of 1922, providing for the allowance of a commission on goods secured otherwise than by purchase, or profits, and a reasonable allowance for general expenses on purchased goods, the court stated:

It will be observed this portion of section 402(d) is divided into two subdivisions, connected by the alternative conjunction "or," which we have italicized. It was the obvious intention of Congress to give to the American purchaser of imported goods some advantages over the foreign importer who produced his goods abroad and then marketed them in this country through its agents or consignees. Therefore, while the section gives to the foreign importer a commission not exceeding 6 per centum, if he incurs such expense, on the other hand it gives to the American importer and purchaser an additional allowance up to 8 per centum for expenses in importing his goods, and allows him profits of not exceeding 8 per centum.

In the case at bar, we are dealing with "purchased goods." The language of the court in the *Johnson* case justifies the logical inference

that, had it been dealing with purchased goods instead of consigned goods in that case, a different conclusion might have been reached. In the instant case, the court is of the opinion, based upon the facts and circumstances before it, that the inspection charges, as well as the charges for transportation, handling, and storage, above referred to, should be allowed as general expenses within the meaning of section 402(e), *supra.*

For the reasons stated, the court makes the following findings of fact:

1. The merchandise in controversy consists of seamless steel tubing, made to the specifications of the American Petroleum Institute, bearing the A.P.I. monogram and exported from Italy on or about July 14, 1955.

2. Houston, Tex., is the principal market of the United States for the sale of such merchandise.

3. The merchandise was appraised on the basis of the selling price in Houston, less a cash discount of 2 per centum, less an allowance of 9.09 per centum for profit and general expenses, less ocean freight, inland freight, and duty.

4. The price did not vary with the quantity purchased.

5. It is the standard practice for United States purchasers of foreign-made seamless steel tubing to have it inspected in the foreign country by an independent agency, the cost thereof being borne by the purchaser.

6. The cost of inspection is separate from and in addition to the purchase price of the tubing.

7. The business of the importer is to import and stockpile such merchandise and sell it from stock.

8. After arrival of the merchandise in the United States, it is transported from the pier by independent warehouse companies to their warehouses or storage yards, and the cost of transportation, handling, and storage, together with other general expenses, amounted to 7.60 per centum.

9. The allowance for profit amounts to 7.15 per centum.

10. The selling price in the United States at time of exportation of the merchandise is as follows:

| Size and grade | Selling price in US |
| --- | --- |
| 2⅜″ x 0.190″ N–80 | $70.39 |
| 2⅞″ x 0.217″ N–80 | 95.25 |
| 2⅜″ x 0.190″ J–55 | 58.50 |

11. The United States value, as defined in section 402(e) of the Tariff Act of 1930, of said merchandise is as follows:

| Size and grade | United States value |
|---|---|
| 2⅜″ x 0.190″ N–80 | $70.39 less 2% less 7.60% for general expenses and 7.15% for profit less ocean freight of $13.50 per metric ton less inland freight of $6 per metric ton less duty of 12½% less 4%. |
| 2⅞″ x 0.217″ N–80 | $95.25 less deductions as above stated. |
| 2⅜″ x 0.190″ J–55 | $58.50 less 2% less 7.60% for general expenses and 7.15% for profit less ocean freight of $13.50 per metric ton less inland freight of $6 per metric ton less duty of 12½%. |

The court makes the following conclusions of law:

1. That the proper basis for appraisement of the subject merchandise is the United States value thereof, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

2. Said values are as set forth in finding of fact number 11.

Judgment will issue accordingly.